Margaret A. BALLEW, Plaintiff,

v.

ASSOCIATES FINANCIAL SERVICES COMPANY OF NEBRASKA, INC., a Nebraska Corporation, Defendant.

No. CV75–L–119.

United States District Court,
D. Nebraska.

Dec. 28, 1976.

Stephen Speicher, Lincoln, Neb., for plaintiff.

Robert D. Zimmerman and James Haszard, Lincoln, Neb., for defendant.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

This is an action brought by the plaintiff as a borrower of money against the defendant as the lender, pursuant to (1) the Consumer Credit Protection Act, 15 U.S.C. §§ 1601 et seq. (hereinafter the Act), and

Federal Regulation Z, 12 C.F.R. §§ 226.1 et seq., adopted by the Board of Governors of the Federal Reserve System pursuant thereto (hereinafter Regulation Z), and (2) the Nebraska Small Loan Act, §§ 45–114 et seq. (R.R.S.1943) (hereinafter the Nebraska Act).

The action revolves around a consumer loan transaction entered into between the parties on November 22, 1974. The transaction is evidenced by a note and security agreement and a loan disclosure statement. The documents disclose an amount financed of $2,108.72 and a finance charge of $699.28, requiring 36 monthly payments of $78.00 each. The transaction of November 22, 1974 (hereinafter Transaction II), was a refinancing of a previous consumer loan negotiated between the parties. That loan (hereinafter Transaction I) was entered into on December 14, 1972. The only document evidencing it is a loan disclosure statement. The amount financed, finance charge, and length and amount of monthly payments were identical to those in Transaction II.

The parties have stipulated that the relationship of defendant to plaintiff is that of creditor to customer, as those terms are defined in the Act and Regulation Z.

The plaintiff initially alleged violations of the Act and Regulation Z with respect to Transaction II such that statutory damages should be assessed, and violations of the Nebraska Act with respect to Transaction II which limit the enforceability of the note. The defendant counterclaimed for the balance of the loan payments due on Transaction II, and I overruled the plaintiff's motion to dismiss the counterclaim by a memorandum and order, filing 35. The plaintiff responded with an "Eleventh Cause of Action" which asserted that Transaction I violated the Act, Regulation Z, and the Nebraska Act. I overruled the defendant's motion to dismiss, even though the statute of limitations had run for the raising of such a claim, on the theory that recovery thereon would represent a recoupment of monies due.

The plaintiff attacks several facets of the transactions:

## I. FINANCE CHARGE

### A. Defendant's use of the Rule of 78's

A problem that pervades this lawsuit is the defendant's use of the Rule of 78's in performing various calculations. The rule is a method of determining what fractional part of a precomputed charge is to be rebated upon prepayment, refinancing, or other occurrence which terminates the transaction prior to maturity. The rule was used by the defendant to determine:

1. The amount of the rebate of unearned finance charges at the refinancing of Transaction I;

2. The amount of the rebate of credit life and credit disability insurance premiums at the refinancing of Transaction I;

3. The amount of the default charges in both transactions; and

4. The amount of the deferment charge assessed in Transaction I.

The parties have stipulated that under this rule the digit one is assigned to the last month in the transaction as originally scheduled, the digit two is assigned to the next-to-the-last month, and so on, until a digit has been assigned to the first month. These digits are then totaled to arrive at the denominator of the fraction. Since Transaction I was to run for 36 months, the last digit assigned was 36 and the sum of the digits, or denominator of the fraction, was 666. The numerator is assigned by assigning digits to months which follow the date of prepayment, starting at one and counting forward. These digits are totaled to determine the numerator. The resulting fraction is multiplied by the total precomputed charge to determine the unearned or unused portion thereof.

The problem with this method is quite simple—it does not produce an actuarially accurate rebate.[1] Judge Denney of this

1. Under the actuarial method, every time a creditor receives a payment he must first calculate the interest due, deduct the interest from the payment made, and apply the balance of

court has ably demonstrated the amount and nature of the variation in *Scott v. Liberty Finance Co.,* 380 F.Supp. 475 (D.C.Neb. 1974). The amount and nature of the variation in the instant case are presented in Appendix A. As is apparent, the difference between the two methods is substantial. In absolute dollars, the variation reaches a peak of $57.98 in the 15th month—i. e., if the loan were prepaid in full in the 15th month, the amount of interest rebated to the borrower would be $57.98 less than the actual amount of unearned interest at that point. The percentage error reaches a peak of 44.73 per cent in the 35th month.

I agree with Judge Denney's conclusion in the *Scott* case that the Rule of 78's does not provide a fair approximation of the unearned finance charge. After performing calculations similar to those in Appendix A, he said, at 380 F.Supp. 478:

" . . . Given this magnitude of error, the Court does not agree with the conclusion of the Ninth Circuit Court of Appeals in the *Bone* [*Bone v. Hibernia Bank,* 493 F.2d 135 (C.A. 9th Cir. 1974)] case. The rule of 78ths does not produce results approximating unearned interest in this case. In making this determination, the Court is guided by other provisions of Regulation Z concerning accuracy. Section 226.5(b)(1) requires disclosure of interest rates to the nearest ¼ of 1%."

Cf. *Burley v. Bastrop Loan Co. Inc.,* 407 F.Supp. 773 (D.C.W.D.La.1976); *Kenney v. Landis Financial Group,* 349 F.Supp. 939 (D.C.N.D.Ia.1972), reversed in part on rehearing, 376 F.Supp. 852 (D.C.N.D.Ia. 1974). See generally, Hunt, "The Rule of 78's: Hidden Penalty in Pre-payment in Consumer Credit Transactions," 55 Boston U.L.Rev. 331 (1975).

The effect of this is that when the plaintiff refinanced Transaction I on November 22, 1974, she received a rebate of the unearned finance charge in an amount less than she would have received if the calculation had been performed actuarially. In effect, she paid an additional charge over and above the interest earned up to that point.

In this regard, the court in *Scott* said: "The Court concludes that the bare disclosure that unearned interest will be computed according to the rule of 78ths does not fulfill the disclosure requirements of 12 C.F.R. § 226.8(b)(7).[2] As discussed above, the rule of 78ths does not compute unearned interest and results in a prepayment penalty. To hold otherwise, would produce anomalous results. For example, if a lender extends credit and prepayment is made by applying the agreed upon interest rate to the outstanding principal, it would have to disclose under 12 C.F.R. § 226.8(b)(6) any penalty which could be imposed upon prepayment of the loan. If a flat $5.00 charge were added to outstanding principal upon prepayment, such charge would have to be disclosed. On the other hand, under the facts of the instant case, a prepayment at the 9th installment would result in a penalty of $16.23, which, if the rule of 78ths were held to be a valid disclosure, would be undisclosed. Keeping in mind the purpose of the Consumer Credit Protection Act, the meaningful disclosure of the cost of credit so that consumers can compare various credit terms, this result would be inconsistent with the stated Congressional purpose." 380 F.Supp. at 479.

the payment to reduce the outstanding balance of the principal. The process is repeated each month.

2. "(b) *Disclosures in sale and nonsale credit.* In any transaction subject to this section, the following items, as applicable, shall be disclosed:

\* \* \* \* \* \*

"(7) Identification of the method of computing any unearned portion of the finance charge in the event of prepayment in full of

an obligation which includes precomputed finance charges and a statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate of such unearned finance charge that will be credited to an obligation or refunded to the customer. If the credit contract does not provide for any rebate of unearned finance charges upon prepayment in full, this fact shall be disclosed."

The court in *Scott* held that § 226.8(b)(7) requires two separate disclosures. The first is the identification of the method used to determine the unearned finance charge—a disclosure of "no independent value to the consumer in comparing credit terms available to him." The second is the "statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate of such unearned finance charge that will be credited to the obligation or refunded to the customer." It is this latter disclosure which provides the consumer with the information he needs to compare credit terms, for he can then compare prepayment penalties, or the absence thereof.

It is perhaps true that this case does not reflect the view of the majority of courts which have considered the issue. See 55 Boston U.L.Rev. at 350–351. However, many of those courts have assumed that the Rule of 78's produced an actuarially accurate rebate or faced situations in which the Rule did in fact produce a more accurate rebate than here. See, for example, *Bone v. Hibernia Bank,* supra.

A greater hurdle here is an interpretation of § 226.8(b)(7) adopted by the Federal Reserve Board:

"§ 226.818 Refund of unearned finance charge; prepayment penalty.

"(a) Under § 226.8(b)(7) a creditor must provide an identification of the method of computing any unearned portion of the finance charge in the event of prepayment of an obligation, as well as a statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate. Section 226.8(b)(6) requires the creditor to provide 'a description of any penalty charge that may be imposed by the creditor or his assignee for prepayment of the principal of the obligation * * *' A question arises whether the computation of certain rebates of unearned finance charges on contracts with precomputed finance charges involves a 'prepayment penalty.' A second question concerns the disclosures required to identify the method of computing any finance charge rebate.

"(b) Section 226.8(b)(6) relates only to charges assessed in connection with obligations which do not involve precomputed finance charges included in the obligation. It applies to transactions in which the finance charge is computed from time to time by application of a rate to the unpaid principal balance. Prepayment penalties which require disclosure under this section (which principally arise in connection with prepayment of real estate mortgages) occur when the obligor in such a transaction is required to pay separately an additional amount for paying all or part of the obligation before maturity. On the other hand, § 226.8(b)(7) is designed to encompass the disclosures necessary with regard to the prepayment of an obligation involving precomputed finance charges which are included in the face amount of the obligation. Therefore, although in a precomputed obligation the finance charge rebate to a customer may be less when calculated according to the 'Rule of 78's,' 'sum of the digits,' or other method than if calculated by the actuarial method, such difference does not constitute a penalty charge for prepayment that must be described pursuant to § 226.8(b)(6).

"(c) Section 226.8(b)(7) requires 'identification' of the rebate method used on precomputed contracts. Many State statutes provide for rebates of unearned finance charges under methods known as the 'Rule of 78's' or 'sum of the digits' or other methods. In view of the fact that such statutory provisions involve complex mathmatical descriptions which generally cannot be condensed into simple accurate statements, and which if repeated at length on disclosure forms could detract from other important disclosures, the requirement of rebate 'identification' is satisfied simply by reference by name to the 'Rule of 78's' or other method, as applicable." Interpretation at 12 C.F.R. 226.818

Additionally, a letter ruling was issued in May, 1974, which supports the defendant's position:

"It is true that the 'Rule of 78's' or the 'sum of the digits' methods do not produce the same return as the actuarial method in the event of early payment of a loan. For example, an 18% annual percentage rate loan prepaid in 6 months would result in an increased yield of 1.2%, and if prepaid in 24 months, an increase of .23%. Under Truth in Lending, however, disclosure of the annual percentage rate is to be made based upon the assumption that the loan will be repaid as agreed. Interpretation § 226.818 [¶ 3566.-11] (on page 22 of the enclosed pamphlet) provides that the difference between the yield under the Rule of 78's and the actuarial method does not constitute a penalty charge for prepayment that must be disclosed subject to § 226.8(b)(6) [¶ 3566]." 5 C.C.H. Consumer Credit Guide, ¶ 31,116

The court in *Scott* discussed this interpretation as follows:

"The interpretative rule refers to 'identification of the rebate method' when discussing 12 C.F.R. § 226.8(b)(7). In reading Section 226.8(b)(7), the Court finds no reference to identification of the rebate method. The Court finds that the identification relates to a method of computing any unearned finance charge. The terms unearned finance charge and rebate are not synonymous. As stated above, the Court reads Section 226.8(b)(7) to require disclosure of the penalty or method of determining the penalty which may result from prepayment of an obligation.

**3.** "(c) If the contract is prepaid in full by cash, a new loan, or otherwise after the first installment due date but before the final installment due date, the borrower shall receive a rebate of an amount which shall be not less than that portion of the precomputed charges, excluding any adjustment for a first installment period of more than one month and any default and deferment charges, applicable to the installment periods scheduled to follow the installment date nearest the date of the prepayment in full. For the purpose of computing the rebate, any prepayment in full made on or before the fifteenth day following an installment date shall be deemed to have been made on the installment date immediately preceding the date of

Such penalty is determined by subtracting from the unearned interest the amount of the rebate of the unearned interest." 380 F.Supp. at 479

Continuing from this observation, I note that the interpretation refers only to the "identification of method" component of § 226.8(b)(7). As noted earlier, that regulation has a second component, requiring a statement of the amount or method of computation of a charge that may be deducted from an otherwise full rebate of unearned finance charges. It is this latter requirement that is addressed here.

When the defendant refinanced Transaction I, it treated Transaction I as having been prepaid in full and applied a rebate based on the Rule of 78's. The loan disclosure statement for Transaction I provided:

"If the loan is prepaid in full prior to maturity, the Borrower will receive a rebate of unearned charges as provided in the Nebraska Installment Loan Act."

The applicable section under the Nebraska Act is § 45–137(2)(c).[3]

The loan disclosure statement for Transaction I also stated:

"If the indebtedness is paid in full after the first installment due date, the Lender will rebate the unearned portion of the FINANCE CHARGE computed by the 'Rule of 78's.'"

In determining the amount to be carried over into Transaction II, the defendant made the following calculations:

prepayment in full and any prepayment in full made after such fifteenth day shall be deemed to have been made on the installment date immediately following the date of prepayment in full. Any default and deferment charges which are due and unpaid may be deducted from such rebate. No rebate shall be required for any partial prepayment. No rebate of less than one dollar need be made. Acceleration of the maturity of the contract shall not in itself require a rebate. If judgment is obtained before the final installment date the contract balance shall be reduced by the rebate which would be required for prepayment in full as of the date judgment is obtained;"

| | |
|---|---|
| Sum of amount financed and the finance charge for Transaction I | $2,808.00 |
| Default charge actually assessed by the defendant at time of refinancing | 19.76 |
| Total payments due at time of refinancing | $2,827.76 |
| Payments made by borrower to retire the debt (actual payments of $822.54 were made by plaintiff, but $91.67 of this represented payments of default or deferment charges and thus were not applied to retire the debt) | – 730.87 |
| | $2,096.89 |

Sum of rebates:

| | |
|---|---|
| unearned interest | $126.01 |
| credit life insurance | 7.36 |
| credit dis. insurance | 13.04 |
| | – 146.41 |

| | |
|---|---|
| Amount from Transaction I carried forward to Transaction II: | $1,950.48 |

The defendant calculated the $126.01 unearned interest rebate by using the Rule of 78's for a refinancing 21 months into the note. At the time of the refinancing, 23 months had in fact elapsed. A deferment of the August, 1973, payment accounted for one of these months. The parties have stipulated that the additional month was granted by the defendant to the end of making sure that no excessive charges were collected. The defendant's end was not accomplished, however. Appendix A reveals that the appropriate unearned interest figure at the 22nd month was $155.79. The difference between this amount and the actual interest rebated to the plaintiff is $29.78, and this represents an additional charge to her.[4] A proper rebate would have produced an amount to carry forward to Transaction II of only $1,920.70, rather than $1,950.48.

4. As noted in section VB, there is a question whether the defendant intended the deferment charge to be a deferment charge or a default charge. Construing it as the latter results in a rebate calculation based on 23 months having expired; for that period, Appendix A discloses an interest rebate of $137.75. A prepayment penalty would still exist, but only of $11.74 rather than $29.78.

5. Disclosures relevant to the issue of default charges are treated at section V.

6. "(a) Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer

The defendant argues that at the time of refinancing it was entitled to some $62.14 in default charges—this in addition to the $19.76 actually assessed and figured into the refinancing. The defendant now urges that even under the actuarial method of rebating, it would have been able to carry forward the amount of $1,920.70 plus $62.14, or $1,982.84 as the amount to be financed in Transaction II.[5] The parties have stipulated to the defendant's answers to the plaintiff's interrogatories on this subject. The refinancing was treated as a prepayment in full, but the defendant calculated default charges due up to that time. It states:

"Total due 78 late charges @ 1.05 equals $81.90. $19.76 was all that we collected $62.14 short, and still due.

\*　　\*　　\*　　\*　　\*　　\*

"In all we have waived a total of $150.00 when we loaned Margaret A. Ballew the money to pay her account in full."

Reconstruction of the amounts which make up this $150.00 figure reveals that the amount of $62.14 is included therein.

■ The reasons that may have prompted the defendant to forgo collection of this $150.00 do not appear on the record and are not important. However, to hold that because the defendant did so it may now exact extra hidden charges at such points as it pleases smacks squarely in the face of a statute aimed at "informed use of credit from the awareness of the cost thereof." 15 U.S.C. § 1601.

■ Such a hidden charge is a violation of 15 U.S.C. § 1639(a)[6] and 12 C.F.R.

credit sale nor under an open end consumer credit plan shall disclose each of the following items, to the extent applicable:

(1) The amount of credit of which the obligor will have the actual use, or which is or will be paid to him or for his account or to another person on his behalf.

(2) All charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge.

(3) The total amount to be financed (the sum of the amounts referred to in paragraph (1) plus the amounts referred to in paragraph (2)).

§ 226.8(j) [7] and § 226.8(b)(7) thereunder.[8] However, I conclude that no violation of the Nebraska Act has occurred. The statute here [9] is substantially like the Iowa statute discussed in *Kenney,* supra. On rehearing, the court decided that the use of the Rule of 78's in calculating the prepayment rebate did not violate the Iowa statute. Cf. Comment: "Consumer Protection: Truth-In-Lending Disclosure of the Rule of 78ths," 59 Iowa L.Rev. 164 (1973). The court pointed to the clause providing for a rebate of that portion of the precomputed interest applicable to the installment period yet to follow.[10] The court determined what interest was so *applicable* by referring to an earlier part of the statute authorizing the use of the Rule of 78's.[11]

Section 45–137(2), R.R.S.Neb.[12] contains a statement identical to that referred to in footnote 11. I conclude that the Nebraska statutes do authorize the calculation of prepayment rebates by the Rule of 78's and

(4) Except in the case of a loan secured by a first lien on a dwelling and made to finance the purchase of that dwelling, the amount of the finance charge.

(5) The finance charge expressed as an annual percentage rate except in the case of a finance charge

(A) which does not exceed $5 and is applicable to an extension of consumer credit not exceeding $75, or

(B) which does not exceed $7.50 and is applicable to an extension of consumer credit exceeding $75.

A creditor may not divide an extension of credit into two or more transactions to avoid the disclosure of an annual percentage rate pursuant to this paragraph.

(6) The number, amount, and the due dates or periods of payments scheduled to repay the indebtedness.

(7) The default, delinquency, or similar charges payable in the event of late payments.

(8) A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates."

7. "(j) *Refinancing, consolidating, or increasing.* If any existing extension of credit is refinanced, or two or more existing extensions of credit are consolidated, or an existing obligation is increased, such transaction shall be considered a new transaction subject to the disclosure requirements of this part. For the purpose of such disclosure, any unearned portion of the finance charge which is not credited to the existing obligation shall be added to the new finance charge and shall not be included in the new amount financed. Any increase in an existing obligation to reimburse the creditor for undertaking the customer's obligation in perfecting, protecting or preserving the security shall not be considered a new transaction subject to this part. . . ."

8. See footnote 2, supra.

9. See footnote 3, supra.

10. "536.13(7)(c) provides, in part:

'If the contract is prepaid in full . . . the borrower shall receive a rebate of an amount which shall be not less than that portion of the precomputed interest . . . applicable to the installment periods scheduled to follow the installment date nearest the date of prepayment in full . . .' "

11. "536.13(7) provides, in part:

'. . . The portion of the precomputed interest applicable to any particular month of the contract . . . shall be that proportion of such precomputed interest . . . which the balance of the contract scheduled to be outstanding during such month bears to the sum of all monthly balances originally scheduled to be outstanding by the contract. . . .' "

12. "(2) Where the contract of loan requires repayment in substantially equal and consecutive monthly installments of principal and charges combined, the licensee may, at the time the loan is made, precompute the charges at the agreed monthly rate on scheduled unpaid principal balances according to the terms of the contract and add such charges to the principal of the loan. Every payment may be applied to the combined total of principal and precomputed charges until the contract is fully paid. All payments made on account of any loan except for default and deferment charges shall be deemed to be applied to the unpaid installments in the order in which they are due. The portion of the precomputed charges applicable to any particular month of the contract, as originally scheduled or following a deferment, shall be that proportion of such precomputed charges, excluding any adjustment made for a first installment period of more than one month and any adjustment made for deferment, which the balance of the contract scheduled to be outstanding during such months bears to the sum of all monthly balances originally scheduled to be outstanding by the contract. All loan contracts made pursuant to this subsection shall be subject to the following adjustment:"

that an otherwise lawful transaction under the Nebraska Act is not rendered usurious because of the use of the Rule of 78's in calculating a prepayment rebate. See 59 Iowa L.Rev. 164, supra.

### B. Filing fee

■ Arguing from the premise that the items which make up the finance charge must be individually itemized, the plaintiff argues that the filing fee paid to perfect the defendant's security interest constituted a part of that finance charge and should have been so disclosed. The applicable statute is 15 U.S.C. §§ 1605(a) and (d)(1).[13] The applicable regulation thereunder is 12 C.F.R. 226.4(a) and (b)(1).[14] The parties have stipulated that a document was filed with the Clerk of the Court of Lancaster County, Nebraska, for both Transaction I and Transaction II concerning the security interest acquired by the defendant. In both, a filing fee was paid by the defendant.

There is no dispute that the filing fee falls within the language of § 1605(d)(1) and § 226.4(b)(1) above, and there has been no itemization or disclosure of the filing fee to the borrower. However, the defendant argues that the premise of §§ 1605(a) and 226.4(a) has not been met—that is, that the filing fee here is not "payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." The defendant argues that the expense incurred by it in paying the filing fee is on the same plane as any other expense incurred by it in its daily operations, be it salaries, electricity, or whatever. In support of this Everett Shirk, the branch assistant vice president of the defendant, testified that the finance charge was computed by applying the maximum allowable interest rate under Nebraska law to the amount financed and that this was the defendant's general practice. He said that, accordingly, the rate does not vary by person or on the basis of whether security is taken.

I agree with this analysis, and find that the filing fee did not meet the conditions of § 1605(a) or § 226.4(a) so as to require disclosure. The necessary tying relationship has not been shown. See *Mondik v. DiSimo,* 386 F.Supp. 537 (D.C.W.D.Pa.1974). The plaintiff argues that the effect of this

---

13. 15 U.S.C. § 1605(a) states:

"Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit, including any of the following types of charges which are applicable:
(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.
(2) Service or carrying charge.
(3) Loan fee, finder's fee, or similar charge.
(4) Fee for an investigation or credit report.
(5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.
§ 1605(d)(1) states:
"If any of the following items is itemized and disclosed in accordance with the regulations of the Board in connection with any transaction, then the creditor need not include that item in the computation of the finance charge with respect to that transaction:

(1) Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction."

14. "(a) *General rule.* Except as otherwise provided in this section, the amount of the finance charge in connection with any transaction shall be determined as the sum of all charges, payable directly or indirectly by the customer, and imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit, whether paid or payable by the customer, the seller, or any other person on behalf of the customer to the creditor or to a third party, including any of the following types of charges:
\*　\*　\*　\*　\*　\*
"(b) *Itemized charges excludable.* If itemized and disclosed to the customer, any charges of the following types need not be included in the finance charge:
(1) Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction."

is to make inoperative 15 U.S.C. §§ 1605(a)(3)–(5), (b), (c), and .(d)(1)–(3). Where the lender indicates a practice of imposing the maximum finance charge that can be imposed under state law regardless of the individual costs associated with it, then that may be true. In such cases, close scrutiny needs to be given to the "amount financed" component and the assessment of default, deferment or other such charges to determine that these extra costs are not hidden therein.

## II. CREDIT INSURANCE AUTHORIZATION—REQUIRED SIGNATURE OF BORROWER

The loan disclosure statement for Transaction II included a section dealing with the authorization of credit insurance. That section discloses the type and cost of such insurance and a statement that "CREDIT INSURANCE, IF INCLUDED, WAS NOT A FACTOR IN THE APPROVAL OF THIS LOAN, IS NOT REQUIRED BY THE LENDER, AND IS FOR THE TERM OF THE CREDIT." At the close of this boxed-off section is a place for the borrower's signature and date with the preface, "I hereby request the lender to procure the credit insurance coverage or coverages checked above."

■ Under 12 C.F.R. § 226.4(a)(5), charges for such insurance must be included as part of the finance charge unless:

"(i) The insurance coverage is not required by the creditor and this fact is clearly and conspicuously disclosed in writing to the customer; and

"(ii) Any customer desiring such insurance coverage gives specific dated and

separately signed affirmative written indication of such desire after receiving written disclosure to him of the cost of such insurance."

Since the defendant did not include such insurance as part of the finance charge, this section had to be complied with to avoid a violation of the Act. The manner by which such disclosures are to be made is covered by 12 C.F.R. § 226.8(a).[15]

■ The plaintiff complains that the disclosure statement designated as "borrower's copy" did not contain the plaintiff's signature on the line in the credit insurance authorization. That line was blank, except for the typed-in date of November 22, 1974. The original was signed and dated as required by Regulation Z. Upon examination of § 226.4(a)(5), I conclude that the plaintiff was not required to sign her copy of the loan disclosure statement authorizing credit insurance. The signature does not serve a disclosure function; rather, it evidences the plaintiff's understanding (1) that the insurance was not required, (2) that she is being charged for insurance premiums, and (3) how much she is paying for such premiums.

The defendant has cited *Hamlet v. Beneficial Finance Co.*, C74–821A (U.S.D.C. N.D.Ga. 11–4–74) (special master's report; judgment entered in accordance therewith on 12–23–74), C.C.H. Consumer Credit, ¶ 98646, pp. 88, 202, in support of its position. There, the lender supplied an unsigned copy of the disclosure statement to the borrower. The borrower later signed the copy. The court held that the Act and Regulation Z were complied with.

Here, the plaintiff was given her copy of the disclosure statement at the time of the .

---

**15.** "(a) *General rule.* Any creditor when extending credit other than open end credit shall, in accordance with § 226.6 and to the extent applicable, make the disclosures required by this section 'with respect to any transaction consummated on or after July 1, 1969. Except as otherwise provided in this section, such disclosures shall be made before the transaction is consummated. At the time disclosures are made, the creditor shall furnish the customer with a duplicate of the instrument or a statement by which the required disclosures are made· and on which the creditor is identified. All of the disclosures shall be made together on either:

(1) The note or other instrument evidencing the obligation on the same side of the page and above the place for the customer's signature; or

(2) One side of a separate statement which identifies the transaction."

transaction. Immediately thereafter she signed the credit insurance authorization on the original. The disclosures of § 226.-4(a)(5) were complied with. She knew that she had signed the original. If she so desired, she could so indicate on her copy, but neither the Act nor Regulation Z required her to do so or the defendant to force her to do so.

## III. DISCLOSURE OF AMOUNT FINANCED

■ The plaintiff next attacks the disclosure of the "amount financed" in that section of the notes and the loan disclosure statements. That section in Transaction II is reproduced below; the heading in Transaction I is identical as to amounts and disclosures made.

| LENDER | LOAN DISCLOSURE STATEMENT |
|---|---|

ASSOCIATES FINANCIAL SERVICES COMPANY OF NEBRASKA, INC.

NEBRASKA

BRANC CODE STREET ADDRESS CITY AND STATE

| ACCOUNT NUMBER | DUE | DEFAULT CHARGE | LOAN DATE | 1ST PAYMENT DATE | LAST PAYMENT DATE | ANNUAL PERCENTAGE RATE → | 19.66 % |
|---|---|---|---|---|---|---|---|
| 040970622 | /.0497 | 11-22-74 | | 12-22-74 | 11-22-77 | FINANCE CHARGE → | 699.28 |

Margaret A. Ballew
874 South 45th Street
Lincoln, Nebraska 68510

| ADD OFFICIAL FEES | 49 | | | | |
|---|---|---|---|---|---|
| CREDIT LIFE INS PREM $53.91 | A & H INSURANCE PREM $95.47 | PHYS DAMAGE INS PREM | FIRE HHG INSURANCE PREM | AMOUNT FINANCED 2108.72 |
| ONE AT 78.00 | AND 35 | SCHEDULE OF PAYMENTS AT 78.00 | | TOTAL OF PAYMENTS 2808.00 |

CO-MAKER

Date Finance Charge Begins To Accrue If Different From Date of Loan ⬆

The Total Of Payments shall be paid in consecutive monthly payments as above indicated beginning on the stated due date for the first payment and continuing on the same date for each succeeding month to and including the stated due date for final payment Every payment made shall be applied to the Total Of Payments

The plaintiff argues that the amount of cash given to the debtor or given on the debtor's behalf is not set out and thus the amounts set out in the "amount financed" are not specifically set out, in violation of 15 U.S.C. § 1639(a)(1)–(3).[16] The statutory wording seems clear that three separate items must be disclosed; only the latter two were disclosed here. While it is true that in fact the first of these can be computed by merely subtracting the second from the third, the Act does not require that debtor do so or expect that he necessarily knows that he can do so. The Act requires disclosure of "the amount of credit of which the obligor will have the actual use or which is or will be paid to him for his account or to another person on his behalf." That has not been done.

The court in *Pollock v. General Finance Corp.*, 535 F.2d 295 (C.A. 5th Cir. 1976), faced this exact issue and concluded that a violation of 15 U.S.C. § 1639(a)(1) had taken place. I agree.

## IV. THE ACCELERATION CLAUSE

■ The plaintiff complains that the acceleration clause violates 12 C.F.R. § 226.-8(b)(4), which requires disclosure of:

"The amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments."

The acceleration clause is contained in the loan disclosure statement for Transaction I and states:

"Default in the payment of any installment of the principal and interest on your loan or part of either, shall at the option of the Licensee, and without notice or demand render the entire balance of the principal and accrued interest at once due and payable."

In Transaction II the clause is contained only in the note and security agreement. It states:

"If any installment of this note or part hereof is not paid when due the entire unpaid amount of this note shall immediately become due and payable without demand or notice."

If the defendant were to accelerate the note and rebate the entire unearned portion of the finance charge at that time, the result would be a shortening of the time for repayment of the principal. The clause thus gives the creditor the right to pursue

16. See footnote 6, *supra*.

his remedies without awaiting the expiration of the contract. Although there is a split of authority on this point, I conclude that in such circumstances there is no violation of § 226.8(b)(4), because no additional charge is made. *Johnson v. McCrackin-Sturman Ford, Inc.,* 527 F.2d 257, 266 (C.A. 3rd Cir. 1975); *Martin v. Commercial Securities Co. Inc.,* 539 F.2d 521 (C.A. 5th Cir. 1976) (summary reported at 45 U.S.L.W. 2199); *McDaniel v. Fulton National Bank of Atlanta,* 395 F.Supp. 422 (D.C.N.D.Ga. 1975). Contra, *Kessler v. Associates Fin. Serv. Co. of Hawaii, Inc.,* 405 F.Supp. 122 (D.C.Hawaii 1975), and cases cited therein.

However, if the rebate were made using the Rule of 78's, then a rebate of less than all the unearned interest would be given. See Appendix A and discussion at I, supra. Hence, an additional charge would have been made and § 226.8(b)(4) would be violated. *Johnson,* supra, 527 F.2d at 267. Cf. Federal Reserve Board Staff Opinion Letter No. 851, 4 C.C.H. Consumer Credit Guide, ¶ 31,173 (10–22–74), cited with approval in *Johnson,* supra.

The document does not identify by what method the rebate would be calculated. The Rule of 78's is referred to in the documents only in reference to calculating the prepayment rebate. While it may be logical to assume that the defendant would also employ the Rule of 78's in calculating the acceleration rebate, such an assumption borders on sheer speculation. I conclude that the plaintiff has not met her burden of proof on this point.

This does not settle this area of inquiry, however, as the plaintiff argues that the defendant must disclose an acceleration clause in the loan disclosure statement, even if it does not result in a specific extra charge.

The court in *Johnson,* supra, held that although it may be true that some borrowers do not know that a creditor can require the entire debt to be due upon default of one installment and that other consequences may flow therefrom, and that it may therefore be desirable to disclose this adequately, there is nothing in the Act or

Regulation Z which requires such disclosure to be made. Cf. *Martin,* supra.

To the contrary is *Woods v. Beneficial Finance Co. of Eugene,* 395 F.Supp. 9 (D.C. Oregon 1975), which requires disclosure of the acceleration clause not under § 226.-8(b)(4) as a charge, but rather under the general "meaningful disclosure" requirement of 15 U.S.C. § 1601. The court acknowledges that disclosure of the right of acceleration is not mentioned in either the Act or Regulation Z. Cf. *Burley v. Bastrop Loan Co. Inc.,* 407 F.Supp. 773, 781 (D.C.W. D.La.1976).

I agree that it is of benefit to borrowers to know that a right of acceleration exists, but I am unwilling to apply the proscriptions of the Act to an area not so covered therein. The right of acceleration is certainly a common clause in consumer loans, and the absence of any provision concerning it in the Act or Regulation Z must be interpreted as a conscious exclusion thereof.

## V. DEFAULT CHARGES AND DEFERMENT CHARGES

### A. Default charges

The applicable clause in Transaction II is contained in the loan disclosure statement. It states:

"In the event of default of any installment for a period of more than 5 days, the Borrower may be required to pay a delinquency and collection charge in an amount equal to the amount which would be refunded to the Borrower had prepayment in full occurred one month prior to the maturity date of the loan."

As noted earlier, the statement provided for the calculation of prepayment rebates by the Rule of 78's. That same loan disclosure statement given to the plaintiff and the note and security agreement contain a box in the heading, titled "Default Charge," in which was written $1.0499 ($1.05 in Transaction I). (A reproduction of the heading is contained at III, supra.)

The statement in the note and security agreement for Transaction II and the loan disclosure statement for Transaction I are slightly different. The loan disclosure statement for Transaction I states:

"In the event of default of more than 5 days in the payment in full of any scheduled installment, the Licensee may charge and collect a default charge not exceeding an amount equal to the precomputed charge applicable to the final installment period."

■ All default charges assessed here were in the amount of $1.05. This figure is arrived at by calculating the unearned interest as if a prepayment in full had occurred one month prior to the maturity of the loan, using the Rule of 78's. The plaintiff points out that the actuarial amount of such interest is $1.90 (see Appendix A) and that the latter quoted clause refers to an actuarial calculation. The plaintiff thus points to an inconsistency between the contract language and the amounts assessed thereunder. To say that the defendant has violated the Act because it says it is going to charge $1.05 and then does so, when in fact the contractual language could be interpreted such that it could have charged $1.90, is spurious. Specific disclosure of exact amounts to be assessed is to be encouraged under the Act as being much more in keeping with its purpose than forcing the borrower to wade through technical contract language. The defendant should not be punished for striving for this goal.[17]

■ Of greater concern to the court is the defendant's assessment of multiple charges. The defendant assessed $1.05 for each month that a particular payment was in default. As the plaintiff fell further behind on Transaction I, the default charge to which the defendant claimed a right reached sizable proportions.[18] Section 45-137(2)(d)[19] clearly allows the defendant to so assess default charges. The issue here is whether the contract so provided in a manner that satisfied the disclosure provisions of the Act and Regulation Z. I find that neither transaction disclosed the multiple nature of the default charges to the plaintiff and that such failure violated 12 C.F.R.

---

17. Had the defendant specified $1.05 and then attempted to charge $1.90, a much different issue would have been presented.

18. For example, the tenth payment was due on October 14, 1973, but not paid until July 19, 1974. The defendant assessed late charges as follows:

"Tenth payment due October 14, 1973 for partial of $73.05. Paid July 19, 1974 $35.36 late charges and $42.64 towards payment. Late charges due as follows:

Starting with November payment: On November payment due 14th.

November 20th, 1.05, then 8 more due on 15th day of each month thru July.
December 15th, 1.05, then 7 more due on 15th day of each month thru July.
January 15th, 1.05, then 6 more due on 15th day of each month thru July.
February 15th, 1.05, then 5 more due on 15th day of each month thru July.
March 15th, 1.05, then 4 more due on 15th day of each month thru July.
April 15th, 1.05, then 3 more due on 15th day of each month thru July.
May 15th, 1.05, then 2 more due on 15th day of each month thru July.
June 15th, 1.05, then 1 ADDITIONAL ON JULY 15th payment.
No late charges can be assessed on the July payment, for July, until 20th

"44 late charges were due at 1.50 = 46.20
Only collected 35.36
Short 10.84 still due"

---

19. "(d) If any installment is unpaid in full for five or more consecutive days, Sundays and holidays included, after it is due, the licensee may charge and collect a default charge not exceeding an amount equal to the portion of precomputed charges applicable to the final installment period and a similar amount may be charged and collected for each succeeding full month from such due date that such installment remains wholly unpaid and outstanding. Such default charges may be collected when due or at any time thereafter;"

§ 226.8(b)(4) [20] and § 226.6(a). [21] The defendant appears to have made a calculated effort to use the wording from § 45–137(2)(d) to disclose the default charge, but then omits the sentence from that section dealing with multiple charges. I can only conclude that that omission was intentional. The defendant argues that implicit in that contract provision is the language that if a payment is missed on a succeeding month, further charges can be made. Disclosure of an implicit type is not what the Act envisions.

### B. Deferment charge

A charge was assessed on December 26, 1973, with the intent of deferring the August 14, 1973, payment over to January 14, 1976. An amount of $30.24 was assessed. The loan disclosure statement provided:

"If the payment date of all wholly unpaid installments is deferred one or more full months, the Licensee may charge and collect a deferment charge not to exceed the portion of the precomputed charge applicable under the original contract of loan to the first month of the deferment period multiplied by the number of months in the deferment period."

The applicable section under Nebraska law is 45–137(2)(e). [22]

The parties have stipulated that the deferment charge was arrived at by multiplying $1.05 (the amount of the default charge which the defendant considered to be applicable under Transaction I) times twenty-nine (the number of months, including August, 1973, remaining in the transaction as originally scheduled). That amount is $30.45, and the defendant waived $.21 of it.

■ This method is basically an accumulation of default charges as they would come due in the future. However, a deferment under § 45–137(2)(e) pushes all payment dates of the loan forward one month. Under both the loan disclosure statement and the Nebraska Act, this is computed by taking the interest applicable to that month's payment (the interest applicable to the August, 1973, payment is $26.63; see Appendix A) times the deferment period,

---

**20.** See section IV.

**21.** "(a) *Disclosures; general rule.* The disclosures required to be given by this part shall be made clearly, conspicuously, in meaningful sequence, in accordance with the further requirements of this section, and at the time and in the terminology prescribed in applicable sections. Except with respect to the requirements of § 226.10, where the terms 'finance charge' and 'annual percentage rate' are required to be used, they shall be printed more conspicuously than other terminology required by this part and all numerical amounts and percentages shall be stated in figures and shall be printed in not less than the equivalent of 10 point type, .075 inch computer type, or elite size typewritten numerals, or shall be legibly handwritten."

**22.** "(e) If, as of an installment due date, the payment date of all wholly unpaid installments is deferred one or more full months and the maturity of the contract is extended for a corresponding period, the licensee may charge and collect a deferment charge not exceeding the charge applicable to the first of the installments deferred, multiplied by the number of months in the deferment period. The deferment period is that period during which no payment is made or required by reason of such deferment. The deferment charge may be collected at the time of defer-

ment or at any time thereafter. The portion of the precomputed charges applicable to each deferred balance and installment period following the deferment period shall remain the same as that applicable to such balance and periods under the original contract of loan. No installment on which a default charge has been collected, or on account of which any partial payment has been made, shall be deferred or included in the computation of the deferment charge unless such default charge or partial payment is refunded to the borrower or credited to the deferment charge. Any payment received at the time of deferment may be applied first to the deferment charge and the remainder, if any, applied to the unpaid balance of the contract; *Provided,* that if such payment is sufficient to pay, in addition to the appropriate deferment charge, any installment which is in default and the applicable default charge, it shall be first so applied and any such installment shall not be deferred or subject to the deferment charge. If a loan is prepaid in full during the deferment period, the borrower shall receive, in addition to the required rebate, a rebate of that portion of the deferment charge applicable to any unexpired full month or months of such deferment period; . . ."

which § 45–137(2)(e) defines as that period during which no payment is made or required by reason of such deferment (here, this is one month, since payments were due again during September, 1973). Thus, if this is in fact a deferment charge, the calculation has been made erroneously and the plaintiff has been overcharged by the amount of $3.61. On the other hand, if this is really a default charge, the defendant has assessed it before it comes due. The acceleration of default charges is not provided for in the note or in the Nebraska Act. The effect of this is another hidden charge to the plaintiff, in violation of § 1639(a)(7) and 12 C.F.R. § 226.8(b)(4).

Furthermore, it exceeds both the maximum default charge and the maximum deferment charge that could have been collected under § 45–137 and thus violates that Act.

### C. Additional default clause

Transaction II contains a clause which reads:

"If two or more full installments are in default for one full month or more at any installment date, the Licensee may reduce the contract balance by the rebate which may be required for prepayment in full on such installment date, and then thereafter in lieu of charging, collecting or receiving charges Revised Statutes of Nebraska, as amended."

The defendant admits that, as written, the clause is nonsensical. The clause was apparently designed to incorporate the provisions of § 45–137(2)(f) of the Nebraska Act:

"If two or more full installments are in default for one full month or more at any installment date and if the contract so provides, the licensee may reduce the contract balance by the rebate which would be required for prepayment in full as of such installment date and the amount remaining unpaid shall be deemed to be the unpaid principal balance and thereafter in lieu of charging, collecting, receiving, and applying charges as provided in this subsection, charges may · be charged, collected, received, and applied at the agreed rate as otherwise provided

by this section until the loan is fully paid."

▉ No attempt has been made to enforce this clause or this section of the Nebraska Act. I conclude that the issue of whether this clause, if written to conform to § 45–137(2)(f), is one to which the disclosure requirements of the Act attach is not before me. As written, it gives no one any rights or duties. As such, no liability can attach.

## VI. LOAN SECURITY

### A. Insurance on the secured property

On the back of the security agreement for Transaction II is this statement:

"ADDITIONAL PROVISIONS

"1. Debtors hereby warrant and covenant that:

\*　　\*　　\*　　\*　　\*　　\*

c. The debtors will keep the Collateral in good order and repair, and will not waste or destroy the Collateral or any part thereof and will not use the Collateral in violation of any applicable statute, ordinance or policy of insurance thereon. The Debtors will keep the Collateral at all times insured against risk of loss, damage by fire, theft and such other casualties as the Secured Party may reasonably require, and as permitted by law, including collision in the case of any motor vehicle for a sum not less than the Obligations secured hereby. If Debtors fail to so insure, the Secured Party may purchase such insurance, or any part thereof, including insurance protecting only the interests of the Secured Party, but shall not be obligated to do so. To the extent that the cost of the premiums for such insurance is not included in this agreement, Debtors agree to pay to the Secured Party, upon demand, as an additional obligation secured hereunder the cost of any such insurance so purchased by the Secured Party together with interest thereon until paid at the annual percentage rate. Losses in all cases shall be payable to the Secured Party and the Debtors as their interest may appear. The Debtors will

pay promptly when due all taxes and assessments upon the Collateral or for its use or operation. The Secured Party may examine and inspect the Collateral at any reasonable time or times wherever located."

■ The plaintiff alleges that the insurance provision constitutes a default charge for which disclosure was required under 15 U.S.C. § 1639(a)(7) and 12 C.F.R. § 226.-8(b)(4). This issue was raised for the first time in the plaintiff's post-trial memorandum. It is not found anywhere in the pleadings and is not listed as a controverted issue in the pretrial order. The plaintiff asserts that the issue is encompassed in issue numbered 10 of the pretrial order. However, the plaintiff's discussion of issue numbered 10 in her pretrial brief belies her assertion now that this issue is encompassed therein. Accordingly, I find this issue not properly before the court and I shall not consider it.

*B. Scope of security interest in Transaction I*

The loan disclosure statement for Transaction I states:

"This transaction is secured by a Security Agreement of even date herewith covering the following described property:

☒All of Borrower's household goods, appliances, furniture and other personal property of like kind and nature now located in or about Borrower's above-stated residence address."

The financing statement filed with the Clerk of the Court of Lancaster County on December 19, 1972, states:

"This financing statement covers the following types (or items) of property:

"Household goods, furniture, utensils, and appliances now owned or hereafter acquired."

The document is signed by the plaintiff and the defendant.

■ Nebraska has adopted U.C.C. 9-204(4)(b), which prevents a security interest from attaching to consumer goods acquired more than ten days after the transaction. Clearly, the financing statement is unenforceable to the extent urged.

The court in *In Re Dunne,* 407 F.Supp. 308 (D.C.R.I.1976), called a lender's inclusion of such an after-acquired property clause in the loan disclosure statement an "inaccurate and patently inadequate description of the security interest in violation of 15 U.S.C. § 1639(a)(8) and 12 C.F.R. 226.8(b)(5)." [23]

In *Johnson v. Associates Finance Inc.,* 369 F.Supp. 1121 (D.C.S.D.Ill.1974), it was the security agreement that contained the invalid after-acquired property clause. The court said:

"The challenged provision fails to clearly and [adequately] define the extent of the defendant's security interest and seems almost patently designed to mislead and confuse the borrower in that regard. As such it violates the spirit of the law as well as the letter of Sections 226.6(c) [24] and 226.8(b)(5) of Regulation Z."

■ The defendant argues that the financing statement confers no rights on the

23. "(5) A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates or, if such property is not identifiable, an explanation of the manner in which the creditor retains or may acquire a security interest in such property which the creditor is unable to identify. In any such case where a clear identification of such property cannot properly be made on the disclosure statement due to the length of such identification, the note, other instrument evidencing the obligation, or separate disclosure statement shall contain reference to a separate pledge agreement, or a financing statement, mortgage, deed of trust, or similar document evidencing the security interest, a copy of which shall be furnished to the customer by the creditor as promptly as practicable. If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired."

24. "(c) *Additional information.* At the creditor's option, additional information or expla-

parties. That, however, does not lessen the attempt to mislead and confuse the borrower. Accordingly, I find that such clause violates § 226.6(c) of Regulation Z. Cf. *Kenney v. Landis Financial Group, Inc.*, 349 F.Supp. 939, 950–51 (D.C.N.D.Ia.1972).

 The plaintiff's claim that the disclosure of the nature and extent of the security interest in Transaction II is also defective is without merit. There the printed form stated:

"All of the consumer goods and personal property of every kind, nature and description including but not limited to household goods, now owned or hereafter acquired by Debtors, located in or about Debtors' residence at address set forth above, including but not limited to and together with any specific goods which may be listed in the following schedule whether or not the same is located in or about Debtors' residence at the address set forth above."

The clause, "now owned or hereafter acquired by Debtors, located in or about Debtors' residence at" was marked out. I conclude that this was done toward the end of deleting the "hereafter acquired" language. Additionally, the defendant typed in the words, "Furniture Listed on Back" and there provided a detailed itemization of the goods covered. I find no basis for finding a violation of the Act or Regulation Z on this point.

## VII. DUE DATES FOR TRANSACTION I

 Lastly, the plaintiff alleges that the defendant violated the Act by initially setting up Transaction I with a first payment due date of December 14, 1972, the same day on which the loan was made. As such, the plaintiff would not have had the use of the entire "amount financed" for the period specified. I find that this was a clerical error and that in all respects the transaction was conducted by both parties as if the first payment were due on January 14, 1973. Furthermore, I find that this error was corrected within 15 days, such that the provisions of 15 U.S.C. § 1640(b) [25] relieve the defendant of any liability.

## DEFENSES

 The defendant urges that the defense of 15 U.S.C. § 1640(c) [26] is applicable to the violations of the Act and Regulation Z. The defendant carries the burden of proof on this point, and I find the evidence wholly inadequate to so establish this defense. Violations related to hidden finance charges, deferment charges greater than those provided for in the contract or in the Nebraska Act, multiple default charges when nothing is said about same in the contract, failure to disclose the amount of credit the obligor would have the actual use of, and assertion of a security interest in after-acquired goods when such is plainly unenforceable are not the type of clerical violations that 15 U.S.C. § 1640(c) was aimed at. See *Palmer v. Wilson*, 502 F.2d 860 (C.A. 9th Cir. 1974); *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (C.A. 7th Cir. 1974); *Ratner v. Chemical Bank New York Trust Co.*, 329 F.Supp. 270 (D.C. S.D.N.Y.1971).

nations may be supplied with any disclosure required by this part, but none shall be stated, utilized, or placed so as to mislead or confuse the customer or contradict, obscure, or detract attention from the information required by this part to be disclosed. . . ."

25. "(b) A creditor has no liability under this section for any failure to comply with any requirement imposed under this part or part E of this subchapter if within fifteen days after discovering an error, and prior to the institution of an action under this section or the receipt of written notice of the error, the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a charge in excess of the amount or percentage rate actually disclosed."

26. "(c) A creditor may not be held liable in any action brought under this section for a violation of this subchapter if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

I likewise find that the violations of the Nebraska Act do not represent the type of "accidental and bona fide error" referred to at § 45–137(5)[27] so as to relieve liability there.

## REMEDY

■ The defendant's violation of the Act and Regulation Z entitles the plaintiff to $1,000 in damages, the costs of the action, and a reasonable attorney's fee. 15 U.S.C. §§ 1640(a)(2)(A) and (a)(3). I conclude that Transaction I and Transaction II should be viewed singly for the purpose of assessing damages under the Act. The transactions involve the same principal sum of money, except for an additional extension of $8.86 in cash in Transaction II. Transaction II is basically an extension of time for the repayment of the amounts loaned in Transaction I. I am supported in this holding by 15 U.S.C. § 1640(g).[28] Cf. *Meyers v. Clearview Dodge Sales, Inc.*, 384 F.Supp. 722, 727 (D.C.E.D.La.1974), aff'd 539 F.2d 511, 520 (5th Cir. 1976).

The defendant's violation of the Nebraska Act means that the lender shall have no right to collect or receive any interest or other charges whatsoever and shall "forfeit and refund to the borrower all interest and other charges collected on the loan involved." § 45–137(5).

Considering these damages and the counterclaim of the defendant for the monies due it, I have made the following calculations:

| | |
|---|---:|
| Amount financed in Transaction II | $2,108.72 |
| Less rebate of unused insurance at time of refinancing | – 20.40 |
| | $2,088.32 |
| Less payments made under Transtion I (since § 45–137(5) forfeits all interest and other charges, all payments made by the plaintiff now are applied to reduce the balance) | – 822.54 |
| | $1,265.78 |

Additional advance made in Transaction II:

| | | |
|---|---:|---:|
| cash | $ 8.86 | |
| credit life insurance | 53.91 | |
| credit disability insurance | 95.47 | |
| | | 158.24 |
| | | $1,424.02 |

| | |
|---|---:|
| Less rebate of unused insurance from Transaction II, computed on the basis that acceleration occurred at the time of defendant's assertion of its counterclaim on January 30, 1976 | – 56.75 |
| | $1,367.27 |
| Less payments made under Transaction II | – 158.08 |
| | $1,209.18 |
| Statutory damages | – 1,000.00 |
| Amount due defendant | $ 209.19 |

This amount is exclusive of costs and a reasonable fee for the plaintiff's attorney. Since no evidence is before me as to such fee, the parties will be given fifteen days to submit affidavits thereon.

Appendix A to follow.

---

27. "(5) In addition to that provided for under sections 45–114 to 45–155, no further or other amount whatsoever shall be directly or indirectly charged, contracted for, or received. If any amount, in excess of the charges permitted, is charged, contracted for, or received, except as the result of an accidental and bona fide error, the contract of loan shall not on that account be void, but the licensee shall have no right to collect or receive any interest or other charges whatsoever. If such interest or other charges have been collected, the licensee shall forfeit and refund to the borrower all interest and other charges collected on the loan involved."

28. "(g) The multiple failure to disclose to any person any information required under this part or part D or E of this subchapter to be disclosed in connection with a single account under an open end consumer credit plan, other single consumer credit sale, consumer loan, consumer lease, or other extension of consumer credit, shall entitle the person to a single recovery under this section but continued failure to disclose after a recovery has been granted shall give rise to additional recoveries."

## APPENDIX A *

| 1 | 2 | 3 | | 4 | | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|
| | Unpaid | Breakdown of $78 | | | | Cum. Unearned Finance Chg. $699.28 | Cum. Unearned | Difference | Percentage |
| Months | Principal | Scheduled Payment | | Cumulative Credit | | – Col 4B | Finance Chg. | Col 5 | Col 5 |
| Elapsed | To Date | A-Principal | B-Interest | A-Principal | B-Interest | (Actuarial Meth.) | (Rule of 78's) | – Col 6 | Col 6 |
| 0 | $2,108.72 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | —— |
| 1 | 2,060.81 | 47.91 | 30.09 | 47.91 | 30.09 | 669.19 | 661.48 | 7.71 | 1.5% |
| 2 | 2,012.42 | 48.39 | 29.61 | 96.30 | 59.70 | 639.48 | 624.73 | 14.75 | 2.30 |
| 3 | 1,963.54 | 48.88 | 29.12 | 145.18 | 88.82 | 610.46 | 589.03 | 21.43 | 3.51 |
| 4 | 1,914.18 | 49.36 | 28.64 | 194.54 | 117.46 | 581.82 | 554.38 | 27.44 | 4.71 |
| 5 | 1,864.32 | 49.86 | 28.14 | 244.40 | 145.60 | 553.68 | 520.79 | 32.90 | 5.94 |
| 6 | 1,813.96 | 50.36 | 27.64 | 294.76 | 173.24 | 526.04 | 488.24 | 37.80 | 7.18 |
| 7 | 1,763.10 | 50.86 | 27.14 | 345.62 | 200.38 | 489.90 | 456.74 | 42.16 | 8.60 |
| 8 | 1,711.73 | 51.37 | 26.63 | 396.99 | 227.01 | 472.27 | 426.29 | 45.98 | 9.73 |
| 9 | 1,659.85 | 51.88 | 26.12 | 448.87 | 253.13 | 446.15 | 396.89 | 49.26 | 11.04 |
| 10 | 1,607.45 | 52.40 | 25.60 | 501.27 | .278.73 | 421.15 | 368.54 | 52.61 | 12.49 |
| 11 | 1,554.52 | 52.93 | 25.07 | 554.20 | 303.80 | 395.48 | 341.24 | 54.24 | 13.71 |
| 12 | 1,501.07 | 53.45 | 24.55 | 607.65 | 328.35 | 370.93 | 314.99 | 55.94 | 15.08 |
| 13 | 1,447.08 | 53.99 | 24.01 | 661.64 | 352.36 | 346.92 | 289.79 | 57.13 | 16.46 |
| 14 · | 1,392.55 | 54.53 | 23.47 | 716.17 | 375.83 | 323.45 | 265.64 | 57.81 | 17.87 |
| 15 | 1,337.48 | 55.07 | 22.93 | 771.24 | 398.76 | 300.52 | 242.54 | 57.98 | 19.29 |
| 16 | 1,281.85 | 55.63 | 22.37 | 826.87 | 421.13 | 278.15 | 220.49 | 57.66 | 20.72 |
| 17 | 1,225.67 | 56.18 | 21.82 | 883.05 | 442.95 | 256.33 | 199.49 | 56.84 | 22.17 |
| 18 | 1,168.93 | 56.74 | 21.26 | 939.79 | 464.21 | 235.07 | 179.54 | 55.53 | 23.62 |
| 19 | 1,111.62 | 57.31 | 20.69 | 997.10 | 484.90 | 214.38 | 160.65 | 53.73 | 25.06 |
| 20 | 1,053.74 | 57.88 | 20.12 | 1,054.98 | 505.02 | 194.26 | 142.80 | 51.46 | 26.49 |
| 21 | 995.28 | 58.46 | 19.54 | 1,113.44 | 524.56 | 174.72 | 126.00 | 48.72 | 27.88 |
| 22 | 936.21 | 59.07 | 18.93 | 1,172.51 | 543.49 | 155.79 | 110.25 | 45.54 | 29.23 |
| 23 | 876.25 | 59.96 | 18.04 | 1,232.47 | 561.53 | 137.75 | 95.55 | 42.20 | 30.63 |
| 24 | 815.39 | 60.86 | 17.14 | 1,293.33 | 578.67 | 120.61 | 81.90 | 38.71 | 32.09 |
| 25 | 753.62 | 61.77 | 16.23 | 1,355.10 | 594.90 | 104.38 | 69.30 | 35.08 | 33.60 |
| 26 | 690.92 | 62.70 | 15.30 | 1,417.80 | 610.20 | 89.08 | 57.75 | 31.33 | 35.17 |
| 27 | 627.28 | 63.64 | 14.36 | 1,481.44 | 624.56 | 74.72 | 47.25 | 27.47 | 36.76 |
| 28 | 562.69 | 64.59 | 13.41 | 1,546.03 | 637.97 | 61.31 | 37.80 | 23.51 | 38.34 |
| 29 | 497.13 | 65.56 | 12.44 | 1,611.59 | 650.41 | 48.87 | 29.40 | 19.47 | 39.84 |
| 30 | 430.57 | 66.56 | 11.44 | 1,678.15 | 661.85 | 37.43 | 22.05 | 15.38 | 41.09 |
| 31 | 362.68 | 67.89 | 10.11 | 1,746.04 | 671.96 | 27.32 | 15.75 | 11.57 | 42.43 |
| 32 | 293.43 | 69.25 | 8.75 · | 1,815.29 | 680.71 | 18.57 | 10.50 | 8.07 | 43.45 |
| 33 | 222.77 | 70.66 | 7.34 | 1,885.95 | 688.05 | 11.23 | 6.30 | 4.93 | 43.90 |
| 34 | 150.34 | 72.43 | 5.57 | 1,958.38 | 693.62 | 5.66 | 3.15 | 2.51 | 44.34 |
| 35 | 76.10 | 74.24 | 3.76 | 2,032.62 | 697.38 | 1.90 | 1.05 | .85 | 44.73 |
| 36 | 0.00 | 76.10 | 1.90 | 2,108.72 | 699.28 | 0.00 | 0.00 | .00 | —— |

* The lender charged interest at the maximum rate allowable under the Nebraska Small Loan Act:

36 per cent per annum on that part of the unpaid principal balance on the first $300
24 per cent on that part of the principal balance in excess of $300 and not in excess of $500
18 per cent on that part of the principal balance in excess of $500 and not in excess of $1,000
12 per cent on any remainder